Good morning, Your Honors. Andrew Pletcher on behalf of Appellant Lindsay Okownowsky. Good morning, and if it may please the Court. Lindsay Okownowsky maintains that tribal issues of fact exist to show that she was subjected to a hostile work environment under Title VII when a high-ranking coworker at the federal prison where she worked posted numerous discriminatory and lewd posts in an Instagram page that was followed, liked, and commented on by her other coworkers. This left Ms. Okownowsky feeling ostracized and isolated as these posts became the water-cooler conversation within FCC LOMPOC and resulted in a change to the  Could I ask you a question about the District Court's order? It's page 19 of the order, 1 ER 20. I think looking there, well, sorry, and on the previous page, the District Court decided five, well, I think first decided there were nine posts that were the subject, and I'm not sure how the District Court narrowed the number of memes to nine, and then I'm going to have a different question about from there it went to five, but did you understand the rationale for that first separation, the idea that the claim arises from nine? Andrew Pletcher Well, our position would be that the, obviously the District Court missed the other posts that we feel are discriminatory and do fall under the Title VII analysis, but there are nine to get, sorry, I apologize. Ms. Okownowsky That's okay. So I couldn't see it in the complaint that it was limited to nine. Was there motions practiced, or can you help me out of where did that come from? Andrew Pletcher I think the court narrowed its focus just through reading the motions and the work. I apologize. I was brought in for the appellate level. I didn't work on the exact motions, but from my reading, the refer to the court's order again, it really comes back to the fact that the court openly disregarded the other posts that it felt. Judge Goldberg And just to be clear, correct me if I'm wrong, there's nothing in the record indicating that the reason the court limited to nine was somehow because the others weren't admissible. There's nothing like that. Is that right? Andrew Pletcher They were correct that they weren't necessarily admissible. The court just felt in its analysis they were not applicable. The court didn't say this doesn't comply with Rule 56 because I have nothing before me that would indicate this could ever get admitted into evidence. Judge Goldberg Correct. Ms. Okownowsky I just want to push back on that a little bit. I agree with Judge Bennett. I couldn't find an evidentiary ruling. But on page 18, the order says plaintiff points to nine total posts. And I can't find where plaintiff posts pointed to a universe limited to nine posts. And if you don't know the answer, that's fine, but that's what I was looking for. Do you know where that came from? Andrew Pletcher It's the court's reading of the plaintiff's opposition at summary judgment. I apologize. I don't have the exact… Ms. Okownowsky You don't have to apologize, but you think it came from there. Maybe nine were discussed. Okay, I'll check there. And then from there, I think that judge decided, I think, that from nine she went to five on page 19 of her order. Andrew Pletcher Correct. Ms. Okownowsky Because it says the other posts, while addressing matters in the workforce, have no perceivable sex-based motive and are most offensive. Andrew Pletcher Yes. From the court's reading, the court notes in the footnote what the ones it considered were the five. The other four that it left out felt that they were outside of a sex-based motive or a Title VII motive to… Ms. Okownowsky Here's my question. If I have a hostile work environment claim and it's specifically a sex-based claim, I have not understood the law to require that each element in the workforce that contributes to that has to both refer to me and to, in this case, the sex-based motive. So, the hypothetical that I've been kicking around is if I'm bringing this kind of claim and I went into the lunchroom at my workplace and there was a Playboy centerfold on the wall, that that could be considered. It wouldn't have to have my name on it or have my face on it, like someone cut out the face and put my face on it, or do anything to specifically refer to me. But I can't tell whether the district court read this the same way. So, let me ask you first. On page 18, she discusses this a bit. She says that it has to be of a sexual nature. I think that's right. I think that's what the case says. But does it does each mean to be considered also have to refer to the plaintiff? Well, it's our position, no, because under this court's precedent, the Christensen case and its other precedent, that the court looking at summary judgments should consider the totality of the circumstances. And here we believe that totality analysis should be applied to really all of the posts. And that's why in our blue brief, we discuss thoroughly the other posts that were Hellman that were not considered by the court. Some of them were sex-based, and those are the kinds of examples that I've mentioned to you that I think maybe should have been considered. We want to talk about that a bit. But that there's others that the district court mentioned that might refer more directly to the plaintiff, but weren't sex-based. You think those should be included too? We do. We think in the in the analysis at, again, the totality of the circumstances analysis at summary judgment, this court should consider all of the posts. And they may have only a maybe a minimal effect when you get to the trial court level, but they should be considered because, you know, this court, or excuse me, the Supreme Court case meritor mentions that Title VII affords employees the right to work in an environment free from discrimination, intimidation, ridicule, and insult. Right, and some of them strike me as sort of bullying and picking on her and belittling her. And I don't mean to make light of that, but I read the complaint to be to be about a sex-based claim. Am I reading it too narrowly? Sex or gender-based claim. Well, sex or gender-based, and we do agree with the position that some of the posts were in response to the fact of when my client made a complaint. Some of the posts were more bullying, but we do think that that should be considered in the totality analysis, at least for purposes of summary judgment. Are you aware of any other case that arose in like the social media context where, I mean, I think this district court probably erred in making a distinction in the social media context of outside work and inside work because social media is all pervasive and you can be reading a post that was posted anywhere, anywhere, anytime, and there were followers within the work force, at least a hundred according to this record, that could have been posting the followers, the like comments or whatever they were doing. Are you aware of any other case that has facts like these kinds of facts where it's Instagram posts or I don't know what else they do? Oh, I apologize. In what our circuit, we are unaware of any cases that really discuss the social media context, at least with these particular facts. We do cite in our brief the Fisher versus FDNY case, talks about one Instagram post and the effect that it had on the workplace, and we think from that, from, it's a district court case, we do realize, but that case and the analysis provided by the district court showed that, you know, they looked at the Instagram post, they recognized it was done, you know, we would hold that Instagram, like the court, like your honor said, can be accessed from anywhere at any time inside the workplace just as much as out. So what is the, you mentioned earlier, I want to follow up on Jed Fordlaw's question. You mentioned earlier this became part of the water cooler kind of conversation at work. Correct. It starts to sound a lot like a hostile work environment. What's the evidence that shows, that supports that characterization? Yes. My client submitted a proposition for summary judgment. It's volume three in the record, starting, I believe, at 251. Specifically, paragraph seven, she talks about the Jeffrey Epstein meme, employees talking about, joking, laughing. Paragraph 20 at 253 in the record, my fears were realized when I witnessed coworkers discussing the content of the page during working hours. I was confident that employees who viewed the page knew that I was the subject of these offensive memes. And then at 255, paragraph 29, she talks about the several employees like the post where the plaintiff was called, the post involving the C word, I won't mention it here, but it's obvious in the record. And then we would also direct the court to the memos written by her at 257, the March 11, 2020 memo, I think thoroughly kind of analyzes her thoughts and feelings, at least around the time in February of 2020 when these posts were going on. Her thoughts and feelings. And so the evidence that would support that this was part of the workplace, I don't want to say gossip or water cooler talking, chat, certainly includes her declaration. I've read that. Does she say, does she say that, maybe it's her complaint, that she, people were sort of snickering about it? Do I remember that from the complaint? Or are you referring to the declaration? You can look at the declaration, but also I'd point to the fact of, it is raised in her memo, specifically when she brought it to the safety manager, Grice, who was really the first person to hear about this Instagram page. The immediate response from the employer was, sorry, not sorry. And they said it was several memos. And she describes that. And in those memos, she describes, you know, what was going on. Should we consider those as well? Were those before the district court? Yes, those were before the district court. And, you know, it's our position that they were, they were really overlooked by the district court, because we feel like it's, it's certainly a thorough amount of evidence to establish not only the offensive memes that were being posted, but then the, what's, what's important here is the employer's reaction to those memes when they, when my client brought them to her employer's attention. And as this court noted in the Wynn case, that's, you know, also a liability when an employer is brought up, or excuse me, when the employee brings up the hostile work environment to the employer, and the employer doesn't in turn begin an immediate investigation or immediate reaction to it. Opposing counsel argues there was a very immediate reaction when a new warden was started. What I can't, and, and, and after your client complained, the first time she was reassigned to low, I guess there's low, medium, and high. Yes. Right. But what I can't tell, even though the assignment happened right away, when was she, when, well, when did she move physically and start working at low? Do you know how long that took? It was a, it was a short time. I believe it was... Over the course of the weekend, I think she took a Monday off, but I can't tell, did she start on Tuesday? It looks like she was transferred to low on February 18th, 2020. And that's where, in her declaration at page, or paragraph 24, and then in her deposition transcript at 341 and 42, she talks about how that first day of being transferred to the low, she ends up running into Hellman. You know, the very, the worst case scenario possible is she... Did he work there? I'm sorry? Did he work there? I thought he, he was immediate. Did he happen, just happened to be there at low? I couldn't figure that out. And I, and, and I, I think the record's very unclear about how he ended up there. And, you know, I'd leave it to, you know, my friend on the other side to maybe enlighten us, but I, I've never been able to figure out how he got there. But nonetheless, you know, she tries to, she voluntarily transfers to low shortly after bringing the complaint and then turns around and runs into him. What is your best guess? I think the record is very mixed about when the, the employer has to know who, who this is. So any, if anything, the inference would be that they did not know early on in those first days after they moved her to low that they didn't know to tell the author of the, of the post, you know, to stay away. So I'm trying to figure out when they first knew. There's indications that she thought she, that he knew about her complaints and was maybe retaliating or making more fun of her again in his Instagram account. But when do we know that? I think there's a March 9 entry, entry where her supervisor says she thinks it's, is his name Hellman? And I would agree with that point. The initial complaint comes in mid-February and probably by, I would say in the record, by early March is when it's identified as Hellman. I would argue that... I don't mean to be difficult. When the, when the management knew? When management knew affirmatively that it was Hellman, however... So then it seems to me that April 15th is the first day they confront Hellman. And he says, that's me. And no, nobody else is posting. I have a note here. Maybe that's consistent, but that, that Okinawski reported Hellman's conduct February 18th, 20, to Warden Engelman, who, who took no action, but referred it to Gonzales, Hellman's supervisor, who actually condoned Hellman's conduct. He said he saw no problem with that. And then he, after that, he slow walked the investigation, but it seemed like he knew it was Hellman. Well, and, and, and that's an important point that I wanted to make as I wrap up my time. I realize I'm short, but you know, it's different to think that maybe my client did not know who was doing the postings, but I think the employers knew. And you think they knew as of? I think they knew as of the moment that my client brought it to their attention. Safety manager Grice's response of sorry, not sorry. And then SIA, Victor Gonzales. Because they were familiar with what the title, if I have that right, of the page meant. Yeah, they were certainly familiar. And that this is a phrase that's in use, aid and hit the gate. I would certainly agree that they were familiar with the page. They were familiar with the post. They, they, it was bringing it to their attention as being problematic, to which they openly said, you know, they openly seem to disagree with on the, on the. Okay, so at some point between mid-February and early March, they knew. So we can nail that down. The first time that management went to Hellman was April 15th, is that right? Correct. When the, the, the threat team assessment assembled on April 13th, they talk about they spent two days roughly doing their investigation. I mean, we would argue that's problematic considering the, the, the nature of this. But it appears April 15th is the first time they actually sat with Hellman and, and Hellman admitted to running the page. But the page went on for another month, is that right? Before it was taken down? Correct. After the threat assessment team, and this is where the district, we feel, we disagree with the district court's analysis that the district court, you know, essentially said the threat assessment team was conducted and the harassment stopped because, because the post did not directly target Okanofsky. However, the post, you know, the post, you know, as noted in the record, were, continued to be sexual in nature after the threat assessment team analysis was done. So clearly... Can I stop you there? Sorry. I don't know how to figure out, and it sounds like you know the date on which these memes appeared. How do I get that out of the record? I think you're referring right now to posts that appeared after they confronted Hellman and, and between that time and when the site was taken down. So where do I look to find out which those were? Yes. The sites regarding Hellman continue to post. It was a late memo. It was April 20th, or excuse me, April 27th, 2020 memo. That starts volume three in the record, 315-3332. Okay. Thank you. All right. Thank you, counsel. You're over your time. Thank you. Good morning, your honors. May it please the court. Zach Varshovy on behalf of the attorney general. This is a very unique case, and it's a unique... Could you try to speak up a little or move the mic closer to you? Of course. Is this better? This is a very unique case, your honors, and it's unique because the allegedly discriminatory and harassing conduct was on a co-worker's personal social media account. And it was discovered by Dr. Okanowski on her personal social media account. And to respond to one of Judge Kristen's questions as to the evidence of it permeating and entering the workplace, according to Dr. Okanowski's admissions, none of the memes were actually displayed at Lompoc. None of the memes were... Well, yes. So in connection with the investigation that Acting Warden Engelman initiated and deputized Agent Gonzalez, he printed out memes to discuss with her her complaints. But with respect to her otherwise seeing the memes posted by co-workers, that was not... She admitted in the workplace she was never sent any of the memes in or outside of the workplace. Okay, but I'm not sure this is that helpful for your client because that... Is it Gonzalez who was meeting with her, was tasked by the Assistant Acting Warden to investigate? He printed them, and I think he's one of the people who tried to encourage her that these were funny. Do I have that wrong? Yes, your honors. So Acting Warden... I'm sorry, Special Agent Gonzalez said something to the effect of, I don't see what the problem is, which we certainly admit was... Was there a comment made while they were looking at what he printed out? Yes, and... But that was during the course of the investigation. Yes, your honor. And ultimately, Special Agent Gonzalez did make the referral to the Office of Internal Affairs on March 9th, after he met with Dr. Okanowski on, I believe, February 26th. Well, I thought that was the threat assessment team that had to come in and found that this... Hellman's conduct violated the workplace violence prevention policy and the Bureau of Prisons anti-harassment policy. And the team said a referral to the Office of Internal Affairs for investigation has been made, and they also ordered Hellman to immediately cease and desist. This seems to be very strong evidence that, in fact, Hellman was creating a hostile work environment for Okanowski and that his superiors and her superiors knew about it and allowed it to happen for a period of several months. So, to respond, your honor, certainly BOP took her complaint seriously, which is why... The threat assessment team didn't come in for a couple months. I mean, it was going on, and the media people were doing nothing. Well, there was the initial referral to the Office of Internal Affairs, and when Dr. Okanowski brought to Acting Warden Engelman's attention that additional content was being posted on April 13th, following the arrival of... So, counsel, there's the initial complaint by Dr. Okanowski, and the people she complained to had access to the posts. They had the ability to look at them, yes? They could access them, yes, your honor. So, would they have had, in the government's view, would they have had the authority with regard to the social media posts that they were able to access to order Lieutenant Hellman cease and desist? Would they have had the ability to do that as supervisory employees at the prison? Under the cease and desist they did eventually do... No, I understand. But would they have had the ability to do it immediately upon their review following Dr. Okanowski's initial complaint? Would they have had the ability to do it then? They wouldn't have, because at that point... I'm sorry, did you say they wouldn't? They would not have, because at the time of the initial complaint, Dr. Okanowski did not identify Lieutenant Hellman as the author. That's a good point. Would they have had the ability to do it as soon as they learned, had good evidence that it was Lieutenant Hellman? They could have. So, if they could have, that is, if the employers at LOMPOC could have, as soon as they knew these posts were Lieutenant Hellman's, they could have ordered him, an employee, to cease and desist from these social media posts. Why isn't that in itself sufficient evidence that these had a large enough effect on the workplace to at least create a triable issue of fact? If they would have had the ability to, as soon as they found it was him, tell him, you have to stop, you can't continue working here if you do this. There were intermediate measures taken as well, Your Honor, so if I could. There was the moment that Dr. Okanowski complained on February 18th, she was transferred to the low, and on March 11th, when she made the... Right, but my question is, the government's position is these things are outside, for the most part, were outside the workplace, right? Correct. So, I'm having trouble connecting that with your answer to my question was, they could have immediately told him to cease and desist. Why isn't that evidence that this did involve the workplace, because if it didn't, how could they have told him to cease and desist? Sure, Your Honor, so to address that question, our position has been the policies that were referenced and enforced in issuing the cease and desist, to direct him to eventually cease from posting the offending conduct. Those are not a sufficient basis to create a Title VII hostile work environment. Can I interrupt and ask, are you now speaking of the social media policies? Is that your answer to Judge Bennett's question? Well, the policies that were referenced in the cease and desist order, so the... I thought those were social media policies. What were they, if they were not social media policies? They were anti-harassment, workplace bullying policies that were in place by the Bureau, which very much function like civility guides. So, you think those policies were sufficient to generate the warrant to cease and desist in response to Judge Bennett's question, but they weren't enough to establish a tribal issue fact about a hostile work environment? Is that what you're saying? Correct, Your Honor, and the reason for that has been our position that the actual evidence as to whether this permeated the workplace enough to have standing under Title VII is that there is no such evidence. According to Dr. Okanowski, the only specific meme she identified as being discussed in the workplace was the Epstein meme, which doesn't implicate her only alleged protected characteristic, which was her gender. Well, then, can we circle back to what Judge Wardlaw had to say about what we do with social media that seems to be ubiquitous, people check it all the time, and I think the record Judge Wardlaw referred to is that 100, or maybe Judge Bennett did, 100, at least it's alleged, 100 different employees had liked these posts, right? Right. So if this has become part of the water cooler sort of discussion, why isn't that enough? Because the evidence in the record, a few points, if I may. So Dr. Okanowski in her declaration makes reference that this page was followed by hundreds of employees. She only identifies four, but more importantly... Including a supervisor, but go ahead. But with respect to what was actually discussed, she only generally refers to the content of the page being discussed, but not all the content on the page actually implicates her alleged protected characteristics. Another way to look at that evidence, the one meme that you're referring to, the Epstein meme, it seems to me an extraordinary violation of the social media policy, and one that directly contradicts and makes very vulnerable the agency's mission, DOC's mission, right? Very concerning. So one way to look at this is that a reasonable trier of fact could say, after that came to their attention, they didn't respond immediately, and that empowers this person to continue. He was, right, sort of impervious to all of it. What about that? I think there were difficulties with treading the line between conduct outside the workplace on a personal social media page that, based on what the investigators were learning, did not... I think it's that Title VII protects against conduct, regardless where it's located, that has an effect on the workplace. I think that's the legal standard. So this distinction, to me, that the district court judge made, it's a false distinction. It just has to have an impact on the working environment, regardless of where the actual conduct occurred. And to briefly respond, Your Honor, with respect to this court's decision in Fuller in 2017, which made clear that a terrible outside-the-workplace sexual assault, that was not enough because that conduct was outside the workplace to move forward with a hostile work environment claim. It's a strong case for your position, but what about Freed and what about Little? Those cases had to do with once the conduct is called to the management's attention, they not only didn't stop it, but they said, no, in those cases, they said go back and continue to serve those customers. In this case, I think what plaintiff's position is that she was directed to get a thicker skin and that this was funny. So why doesn't that reinforce this notion that this would be sufficient? Sure, and I'm happy you brought that up, Judge Christin, because I did want to respond to my colleague's point as to Mr. Grice. At ER 259, the plaintiff describes, Dr. Okonowski describes in her memo, her conversation with Mr. Grice, which occurred on Instagram. And this was on the same weekend that she initially complained and had this, what she described as an existing friendly relationship with Mr. Grice, where they disagreed as to the appropriateness of the page. And then later testified, her testimony is at ER 128, where she described no other subsequent interactions with Mr. Grice. So our point is certainly Mr. Grice was not understanding of her position, but that was not as we never – Just circle back, if you would, to engage with Judge Wardlaw's question. Because she's asking about this, isn't it enough that it affects the workplace environment? And what you're describing is another way where these co-workers were communicating, right, through online or however they're communicating, and it's through an Instagram account or over email. So why isn't that all fair game for the trier of fact to consider? Sure, so our position has always been that it's not simply that. If it occurs only outside the workplace – or outside the workplace, conduct can never be considered. Our position has been there must be some actual workplace conduct. And in this case, the evidence that's in the record shows that there really was no actual workplace discussions as to the offending content on the page. So counsel, let me ask you what perhaps is a silly question harkening back to an era before we had the Internet and social media. Maybe a ridiculous kind of question. Let's say that Lieutenant Hellman, on a public street 75 yards from Lompoc, but a public street not on federal government property, was parading, walking up and down, where cars went by to enter with holding signs with these memes on them. Would the government's argument in that hypothetical be the same? It's like, well, you know, people who are entering could see them, people who work there could see them, but he wasn't really on the property. So even if these memes were offensive and people could know they were directed to Dr. Okanowski, this doesn't create a hostile work environment because it's off the premises and the fact that people can see them isn't enough as long as they're not talking about him at work? Yes, Your Honor, and it would be that because if there's no evidence that the offending conduct there was actually discussed in the workplace, the plaintiff was exposed to it or her working conditions were altered, then at that point, then no, there wouldn't be an actionable hostile work environment claim under Title VII. I see I'm low on time. If there's no further questions from Your Honor. I think I just answered my last one. Thank you. Thank you very much, Your Honor. I'm going to submit this case. Okanowski v. Garland is submitted. We've previously submitted Libman v. United States and this session of the Court is adjourned for today. All rise. This Court, for this session, stands adjourned.
judges: WARDLAW, CHRISTEN, BENNETT